UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

ELAINE M. CHANDLER,

                         Plaintiff,                    5:17-CV-0457
                                                       (GTS/ATB)
v.

HOUGHTON MIFFLIN HARCOURT PUBL'G
CO., AND ITS EMPLOYEES; MASSIMO RUBINI,
Individually and in His Official Capacity; and JOHN
HURLEY, Individually and in His Official Capacity,

                         Defendants.
_____

APPEARANCES:                                           OF COUNSEL:

ELAINE M. CHANDLER
  Plaintiff, *Pro Se*
412 Cleveland Blvd.
Fayetteville, New York 13066

BOND, SCHOENECK & KING, PLLC                           LAURA H. HARSHBARGER, ESQ.
  Counsel for Defendants                               SUZANNE M. MESSER, ESQ.
One Lincoln Center
Syracuse, New York 13202

GLENN T. SUDDABY, Chief United States District Judge

## DECISION and ORDER

        Currently before the Court, in this *pro se* employment discrimination action filed by

Elaine M. Chandler ("Plaintiff") against Houghton Mifflin Harcourt Publishing Company

("HMH") and two of its employees, Massimo Rubini, and John Hurley (collectively

"Defendants"), is Defendants' motion to dismiss Plaintiff's Amended Complaint for failure to

state a claim upon which relief can be granted, pursuant to Fed. R. Civ. P. 12(b)(6). (Dkt. No.

28.)  For the reasons set forth below, Defendants' motion is granted.

# I.    RELEVANT BACKGROUND

## A.    Plaintiff's Amended Complaint

Generally, liberally construed, Plaintiff's Amended Complaint alleges as follows. (Dkt. No. 25 [Pl.'s Am. Compl.].)

### Plaintiff's Professional Responsibilities at HMH

HMH is a publisher of textbooks and digital educational programs. (*Id.*, ¶ 10.) In February of 2014, HMH hired Plaintiff as an Account Executive to serve the Upstate New York and Western Pennsylvania areas of HMH's operations where Plaintiff sold textbooks and digital education programs to private, parochial and charter schools. (*Id.*, ¶ 13.) Plaintiff worked from home but would drive across New York and Pennsylvania to visit schools, present textbook programs, attend book exhibits, and promote HMH's education programs at luncheons and other promotional gatherings. (*Id.*, ¶ 16.)

### Defendant Massimo Rubini

In November of 2014, Plaintiff's supervisor, Amy Senius, informed Plaintiff that a new employee, Defendant Rubini, had been hired for an entry-level position, and asked Plaintiff to help Rubini "get up to speed on HMH products." (*Id.*, ¶ 18.) When Plaintiff first met Defendant Rubini, she told him that Ms. Senius had asked her to assist Rubini, and invited him to attend an upcoming presentation to school principals in Albany, NY. (*Id.*, ¶ 19.) Defendant Rubini did not verbally respond to Plaintiff; rather, he gave a sly smile, looked Plaintiff up and down, and walked away. (*Id.*, ¶ 20.) In January of 2015, Ms. Senius announced that Defendant Rubini had been promoted from his entry-level position to Ms. Senius's Assistant Manager and informed Plaintiff that she was to report to Rubini. (*Id.*, ¶¶ 21-22.)

In April of 2015, Defendant Rubini informed Plaintiff that he would be attending her presentations on two consecutive days.  (*Id.*, ¶ 23.)  At some point during the first day of presentations, Defendant Rubini looked Plaintiff up and down and made comments about her outfit.  (*Id.*, ¶ 27.)  Later that same day, Defendant Rubini hugged Plaintiff more tightly and for longer than a casual friend would do.  (*Id.*, ¶ 29.)  Plaintiff informed Defendant Rubini that the hug felt uncomfortable.  (*Id.*, ¶ 30.)  During the second day of presentations, Defendant Rubini once again looked Plaintiff up and down and commented on her outfit.  (*Id.*, ¶ 32.)

In May of 2015, Defendant Rubini attended a luncheon that Plaintiff had scheduled in Pittsburgh, PA, for the Superintendent and other top administrators of the Diocese of Pittsburgh. (*Id.*, ¶ 33.)  At the end of the luncheon, while the administrators were still present, Defendant Rubini hugged Plaintiff and slid his hand down her backside.  (*Id.*, ¶ 34.)  After the administrators left, Plaintiff told Defendant Rubini that she did not want to be touched in that way and that it was highly inappropriate.  (*Id.*, ¶ 36.)  Defendant Rubini responded by saying that "I was hired because I have special qualities."  (*Id.*, ¶ 37.)  At another presentation for administrators in Pittsburgh, PA, in July of 2015, Defendant Rubini looked Plaintiff up and down but kept his distance from her.  (*Id.*, ¶ 39.)

On September 24, 2015, Defendant Rubini attended Plaintiff's scheduled school visits with her.  (*Id.*, ¶ 41.)  At the end of the day's visits, Defendant Rubini directed Plaintiff to present a revenue plan to him to the lobby of his hotel.  (*Id.*, ¶ 42.)  Plaintiff presented a revenue plan as requested and Defendant Rubini expressed his appreciation for the plan.  (*Id.*, ¶¶ 43-44.) Defendant Rubini then hugged Plaintiff and slid his hand down her backside.  (*Id.*, ¶ 44.) Plaintiff told Defendant Rubini once again that she did not like his behavior and that she was

going to report it. (*Id.*, ¶ 45.) The following day, Plaintiff researched how to report sexual

harassment on HMH's employee website and discovered that the procedure was to report the

behavior to the employee's immediate supervisor. (*Id.*, ¶ 46.) Because Defendant Rubini was

Plaintiff's immediate supervisor, she felt too intimidated to file a complaint regarding Rubini's

inappropriate behavior with Rubini. (*Id.*, ¶ 47.) Instead, Plaintiff confided to two other account

executives. (*Id.*, ¶ 48.)

From October until December 2015, Defendant Rubini did not contact Plaintiff to visit

schools together. (*Id.*, ¶ 49.) On December 23, 2015, Defendant Rubini called Plaintiff

regarding her performance review for 2015. (*Id.*, ¶ 50.) Defendant Rubini advised Plaintiff that

the telephone call was a substitute for HMH's required face-to-face discussion regarding

performance evaluations. (*Id.*) Defendant Rubini then informed Plaintiff that she was receiving

a poor performance rating of "does not meet expectations." (*Id.*, ¶ 51.) When Plaintiff

questioned Rubini's evaluation, he responded that it was because Plaintiff's territory goal was at

64%. (*Id.*, ¶ 52.) Plaintiff reminded Defendant Rubini that he was well aware of the large

amount of orders that had been placed on hold due to a school budget impasse in Pennsylvania,

and that, when those orders were taken into account, her territory goal was at 92%. (*Id.*, ¶ 53.)

Defendant Rubini responded that Plaintiff's poor review was based on a "commit ratio," which is

an algorithm in HMH's online sales reporting system. (*Id.*, ¶ 54.) No one had ever discussed the

term or concept of a "commit ratio" with Plaintiff before. (*Id.*, ¶ 55.) Plaintiff refused to sign off

on her performance review and instead sent an e-mail message to HMH's Human Resources

("HR") Department regarding Defendant Rubini's evaluation. (*Id.*, ¶ 56.) When HMH's HR

Department e-mailed Defendant Rubini, Rubini denied that he had discussed a "commit ratio"

during his performance review of Plaintiff. (*Id.*, ¶ 57.)

<u>Defendant John Hurley</u>

In late December of 2015, Plaintiff learned that, as of January 1, 2016, Defendant Rubini would no longer be her manager and she would be supervised by HMH NY Field Sales Manager Lynn Robson. (*Id.*, ¶ 64.) However, Plaintiff was then contacted by a second-level manager, HMH Mid-Atlantic District Manager John Hurley, and was told that Hurley himself would be traveling from Chicago, Illinois, to Upstate New York to work with Plaintiff exclusively. (*Id.*, ¶ 65.)

From February 9, 2016, through February 11, 2016, Defendant Hurley traveled to Albany, NY, with Plaintiff, and accompanied her on school visits. (*Id.*, ¶ 70.) Instead of the usual practice of taking separate cars to school visits, Defendant Hurley informed Plaintiff that he would be riding with her in her car. (*Id.*, ¶ 71.) While sitting in Plaintiff's car in a parking lot after the first school visit, Defendant Hurley told Plaintiff that he was good friends with Defendant Rubini and that Hurley did not like the way that Plaintiff had treated Rubini. (*Id.*, ¶ 72.) Defendant Hurley told Plaintiff that he hoped she would treat him better than she had treated Defendant Rubini. (*Id.*, ¶ 73.) As Defendant Hurley said this, he took Plaintiff's hand and held it in his own. (*Id.*, ¶ 74.) When Plaintiff asked Defendant Hurley what he meant, he released her hand and instructed her to drive to the next school visit. (*Id.*, ¶ 75.) Later, while driving between school visits, Defendant Hurley repeated the statement that he hoped Plaintiff would treat him better than she had treated Defendant Rubini. (*Id.*, ¶ 76.) Defendant Hurley could not take Plaintiff's hand because she was using the car's steering wheel; as a result, Defendant Hurley rubbed Plaintiff's forearm. (*Id.*, ¶ 77.) Plaintiff again asked Defendant Hurley what he meant and he did not respond and removed his hand. (*Id.*, ¶ 78.) Defendant

Hurley, who was married, was well known by other account executives within HMH for having had at least one affair with a female HMH employee. (*Id.*, ¶ 80.)

On February 10, 2016, while eating lunch at a restaurant with Defendant Hurley, Plaintiff reported to Hurley that Defendant Rubini had acted inappropriately by hugging and groping her. (*Id.*, ¶ 81.) Plaintiff reported Defendant Rubini's behavior to Defendant Hurley with the expectation that, as Rubini's superior, Hurley would report Rubini's inappropriate behavior. (*Id.*, ¶ 82.) Plaintiff also hoped that, by reporting Rubini's inappropriate behavior, Defendant Hurley would no longer direct innuendos toward her. (*Id.*, ¶ 83.) Instead, Defendant Hurley became annoyed, looked away, and said, "Well, he's Italian." (*Id.*, ¶ 84.) After lunch, Defendant Hurley told Plaintiff to drop him off at his hotel and that he would not be accompanying her on school visits for the rest of the day. (*Id.*, ¶ 85.) Defendant Hurley told Plaintiff to arrive at the lobby of his hotel the next morning at 8:30 a.m. (*Id.*, ¶ 86.)

The next morning, Plaintiff arrived at the hotel lobby at 8:30 a.m. and met Defendant Hurley. (*Id.*, ¶ 87.) Hurley instructed Plaintiff to wait in the lobby while he finished some paperwork. (*Id.*, ¶ 88.) After approximately one hour, Defendant Hurley reappeared and presented Plaintiff with a thirty-day performance improvement plan that was impossible to execute. (*Id.*, ¶ 89.) Plaintiff asked Defendant Hurley why she was being punished. (*Id.*, ¶ 91.) Defendant Hurley responded that he was told to do this by the "powers that be." (*Id.*, ¶ 92.) Plaintiff asked who the "powers that be" were. (*Id.*, ¶ 93.) Defendant Hurley became visibly flustered and said "My supervisors!" but would not give any names. (*Id.*, ¶ 94.) Defendant Hurley told Plaintiff that he would not accompany her on any more school visits. (*Id.*, ¶ 95.)

From February 11, 2016, until March 4, 2016, during the time period of the performance improvement plan, Defendant Hurley became increasingly hostile towards Plaintiff, telling her that she must perform numerous impossible expectations not written into the original performance improvement plan.  (*Id.*, ¶ 98.)  Defendant Hurley threatened to fire Plaintiff if she did not execute the plan exactly and he told her to.  (*Id.*, ¶ 99.)  Other HMH employees placed on performance improvement plans had not been required to complete such impossible tasks as those assigned to Plaintiff by Defendant Hurley.  (*Id.*, ¶ 103.)

<u>Plaintiff's Sexual Harassment Complaint</u>

On February 19, 2016, Plaintiff filed a sexual harassment complaint directly with HMH's HR administrators.  (*Id.*, ¶ 105.)  HMH's HR Department did not respond to Plaintiff's complaint until seven days later, on February 26, 2016.  (*Id.*, ¶ 106.)  HMH's HR representative, Barbara Schmidt, called Plaintiff to inquire about the details of her complaint.  (*Id.*, ¶ 107.)  Plaintiff told Ms. Schmidt that she had been retaliated against for her rejection of, and reaction to, unwelcome sexual advances with a poor performance review, as well as put on an impossible performance improvement plan.  (*Id.*, ¶ 112.)  Ms. Schmidt told Plaintiff that there would be an investigation and she would contact Plaintiff the following week.  (*Id.*, ¶ 113.)

The following week, around March 2, 2016, Plaintiff called Ms. Schmidt and left her a message inquiring about the status of Ms. Schmidt's investigation.  (*Id.*, ¶ 114.)  Ms. Schmidt did not return Plaintiff's telephone call.  (*Id.*, ¶ 115.)  Instead, Defendant Hurley called Plaintiff and told her that he wanted to schedule a telephone meeting for the following day at 5:00 p.m.  (*Id.*, ¶ 116.)  Defendant Hurley did not tell Plaintiff what he wanted to discuss.  (*Id.*, ¶ 117.)  It was well known at HMH that managers would set up a mysterious telephone meeting for a Friday at 5:00

p.m. when they intended to lay off or fire an employee.  (*Id.*, ¶ 118.)  Within the previous two

weeks, Defendant Hurley had threatened to fire Plaintiff.  (*Id.*, ¶ 119.)

   Under these extremely stressful circumstances, Plaintiff was forced to negotiate an exit

from HMH.  (*Id.*, ¶ 120.)  Plaintiff called Ms. Schmidt and left a message that she wanted to

negotiate an exit from the company.  (*Id.*, ¶ 121.)  Ms. Schmidt returned Plaintiff's call

immediately and put together a severance agreement, which was mailed to Plaintiff to sign.  (*Id.*,

¶¶ 122-23.)  Plaintiff signed the severance agreement, effective in March of 2016.  (*Id.*, ¶ 124.)

   After signing the Confidential Separation Agreement and General Release ("Release"),

Plaintiff had no intention of filing a complaint with the U.S. Equal Employment Opportunity

Commission ("EEOC") or a federal lawsuit.  (*Id.*, ¶ 133[a].)  However, disturbing events

occurred after the Release, resulting in Plaintiff's acquisition of a post-Release claim.  (*Id.*, ¶

133[c].)  These events include Defendant Hurley making comments to at least two other HMH

managers regarding the Release and disparaging Plaintiff's work ethic and character.  (*Id.*, ¶

133[e].)  Defendant Hurley also disparaged Plaintiff's work ethic and character to supervisory

employees at Plaintiff's previous employer, McGraw-Hill.  (*Id.*, ¶ 133[f].)  Defendant Hurley

and a manager from McGraw-Hill have spread information related to Plaintiff's complaint and

the Release to other publishers.  (*Id.*, ¶ 133[g].)  This conduct has prevented Plaintiff from

obtaining employment in the textbook industry because HMH and McGraw-Hill are the two

largest global education publishers.  (*Id.*, ¶ 133[h].)

   In response to the EEOC investigation, HMH attorney, John F. Welsh, submitted a

position statement, which demonstrated that Defendant Hurley had knowingly perjured and

disparaged Plaintiff's character.  (*Id.*, ¶ 133[i].)  Specifically, Mr. Welsh stated on four occasions

in his letter that Plaintiff had taken a job at McGraw-Hill and that she complained of sexual
harassment in order to extract money from HMH when she already had another job lined up.
(*Id.*, ¶ 133[j].)  Defendant Hurley reported this information to Mr. Welsh knowing that it is false
and in retaliation for Plaintiff having filed a complaint.  (*Id.*, ¶¶ 133[k-l].)

Based upon the foregoing, Plaintiff's Amended Complaint asserts the following fifteen
claims: (1) a claim that HMH discriminated against Plaintiff and failed to take effective action in
response to her complaints of sexual harassment by Defendant Rubini in violation of Title VII;
(2) a claim that HMH discriminated against Plaintiff and failed to take effective action in
response to her complaints of sexual harassment by Defendant Rubini in violation of N.Y. Exec.
Law § 296; (3) a claim that HMH discriminated against Plaintiff and failed to take effective
action in response to her complaints of sexual harassment by Defendant Rubini in violation of
New York Civil Rights Law § 40-c; (4) a claim that HMH discriminated against Plaintiff and
failed to take effective action in response to her complaints of sexual harassment by Defendant
Rubini in violation of the New York State Constitution, Article 1, § 11; (5) a claim that
Defendant Rubini conditioned Plaintiff's continued employment on her acquiescence to his
sexual demands and conduct and is therefore an aider and abettor within the meaning of N.Y.
Exec. Law § 296; (6) a claim that Plaintiff suffered intentional infliction of emotional distress as
a result of being subjected to unwanted and unwelcome sexual overtures and touching by
Defendant Rubini; (7) a claim that Plaintiff suffered intentional infliction of emotional distress as
a result of HMH's failure and/or refusal to take effective remedial action after she complained
about Defendant Rubini's sexual harassment; (8) a claim that HMH discriminated against
Plaintiff and failed to take effective remedial action in response to her complaints that Defendant

Hurley (a) sexually harassed her, (b) failed to report Defendant Rubini's sexual harassment of her to HMH, and (c) retaliated against her by changing aspects of her employment in violation of Title VII; (9) a claim that HMH discriminated against Plaintiff and failed to take effective remedial action in response to her complaints that Defendant Hurley (a) sexually harassed her, (b) failed to report Defendant Rubini's sexual harassment of her to HMH, and (c) retaliated against her by changing aspects of her employment in violation of N.Y. Exec. Law § 296; (10) a claim that HMH discriminated against Plaintiff and failed to take effective remedial action in response to her complaints that Defendant Hurley (a) sexually harassed her, (b) failed to report Defendant Rubini's sexual harassment of her to HMH, and (c) retaliated against her by changing aspects of her employment in violation of New York Civil Rights Law 40-c; (11) a claim that HMH discriminated against Plaintiff and failed to take effective remedial action in response to her complaints that Defendant Hurley (a) sexually harassed her, (b) failed to report Defendant Rubini's sexual harassment of her to HMH, and (c) retaliated against her by changing aspects of her employment in violation of New York State Constitution, Article 1, § 11; (12) a claim that Defendant Hurley conditioned Plaintiff's continued employment on her acquiescence to his sexual innuendos and Defendant Rubini's demands and conduct and is therefore an aider and abettor within the meaning of N.Y. Exec. Law § 296; (13) a claim that Plaintiff suffered intentional infliction of emotional distress as a result of being subjected to unwanted and unwelcome sexual innuendos and overtures by Defendant Hurley; (14) a claim that Plaintiff suffered intentional infliction of emotional distress as a result of being forced to leave her employment with HMH in retaliation for complaining about Defendant Rubini's sexual harassment; and (15) a claim against HMH for intentional infliction of emotional distress as a

result of Defendant Hurley spreading information about Plaintiff's complaint and Release as well as disparaging her work ethic and character.  (*Id.*, ¶¶ 134-229[f].)

    **B.**    **Parties' Briefing on Defendants' Motion**

        **1.**    **Defendants' Memorandum of Law**

Generally, Defendants' motion asserts the following five arguments.  (Dkt. No. 28, Attach. 2 [Defs.' Mem. of Law].)

First, Defendants argue that Plaintiff has waived her first fourteen claims because those claims accrued before she left her employment with HMH and she signed a general release of all potential claims as part of her Confidential Separation Agreement.  (*Id.* at 15.)[1]  Furthermore, Defendants argue that the Release is enforceable because Plaintiff has not alleged facts plausibly suggesting that it was the product of fraud, undue influence, or that she lacked the sophistication to understand the clearly worded agreement.  (*Id.* at 16.)  Although Plaintiff alleges that she believed Defendant Hurley was going to fire her and that this "forced" her to "negotiate an exit" from her employment, Defendants argue that this does not plausibly suggest duress because (a) Plaintiff has not alleged that HMH used the possibility of firing her as leverage during the release negotiations, and (b) in any event, even if Plaintiff alleged facts plausibly suggesting that she entered the Release under duress, she did not revoke her acceptance of the agreement during the seven-day period afforded to her after her acceptance, and she has ratified the agreement by keeping the monetary payment that she received.  (*Id.* at 17-18.)

---

       [1]    Page citations refer to the page numbers used on CM/ECF rather than the actual page numbers contained in the parties' respective motion papers.

Second, in the event that this Court believes that Plaintiff's factual allegations are sufficient and that there is a factual issue related to the validity of the Release, Defendants request that the Court order limited discovery on the issue with leave for Defendant to immediately file a motion for summary judgment upon the completion of discovery.  (*Id.* at 18-19.)

Third, with regard to Plaintiff's fifteenth claim, Defendants argue that any statements made to the EEOC in defense of Plaintiff's EEOC complaint are absolutely privileged.  (*Id.* at 19-20.)  Furthermore, Defendants argue that any allegations that Defendant Hurley said negative things to a friend about Plaintiff's work ethic and character and/or that he disclosed information regarding her complaint and release cannot serve as a basis for a claim of intentional infliction of emotional distress because it is well settled that such criticism does not amount to "extreme and outrageous" conduct.  (*Id.* at 20.)

Fourth, Defendants argue that the claims against Defendant Rubini should be dismissed because Plaintiff has not alleged facts plausibly suggesting that any of his alleged misconduct occurred after she signed the Release.  (*Id.* at 21.)

Fifth, and finally, Defendants argue that the claims against Defendant Hurley should be dismissed because Plaintiff has not alleged facts plausibly suggesting that any of his alleged misconduct occurred after she signed the Release.  (*Id.*)  Although Plaintiff alleges that Defendant Hurley's statements form the basis of her fifteenth claim, Defendants argue that Plaintiff asserted that claim against HMH only.  (*Id.*)

### 2.    Plaintiff's Opposition Memorandum of Law

Generally, liberally construed, Plaintiff's opposition memorandum of law asserts the following four arguments.  (Dkt. No. 30 [Pl.'s Opp'n Mem. of Law].)

First, Plaintiff argues that Defendants have invalidated the terms of the Release, because they violated the "non-disparagement" clause of the Release by falsely disparaging her character to third-parties.  (*Id.*, ¶¶ 4, 7, 17-18.)  Plaintiff cites page 3 of the Release in support of her argument that the Release binds not simply Plaintiff but Defendants.  (*Id.*, ¶¶ 5-6.)

Second, Plaintiff argues that she is not claiming that she was forced to enter into the Separation Agreement and Release under duress.  (*Id.*, ¶ 8.)

Third, Plaintiff argues that, even if the statements made to the EEOC by Defendants are privileged, those statements should still be considered because they demonstrate that Defendant Hurley intentionally spread false and disparaging information about her and that Defendant Hurley knowingly perjured himself.  (*Id.*, ¶ 11.)

Fourth, and finally, Plaintiff argues that her claims for intentional infliction of emotional distress should not be dismissed because (a) Defendant Hurley intentionally spread false and disparaging statements about her, and (b) she suffered sexual harassment from both Defendants Hurley and Rubini.  (*Id.*, ¶¶ 12-16.)

### 3.    Defendants' Reply Memorandum of Law

Generally, Defendants' reply memorandum of law asserts the following two arguments. (Dkt. No. 31 [Defs.' Reply Mem. of Law].)

First, Defendants argue that Plaintiff has conceded in her opposition memorandum of law that the Confidential Separation Agreement and Release are valid and that she is not claiming

that they are invalid because of duress.  (*Id.* at 4.)  Furthermore, Defendants argue that they

could not have invalidated the terms of the Release by making negative statements about

Plaintiff because the Release does not contain any provisions requiring HMH or its employees to

maintain confidentiality of the Agreement or prohibiting them from making negative statements

about Plaintiff.  (*Id.* at 5.)

Second, Defendants reiterate their argument that Defendant Hurley's statements to the

EEOC are privileged and Plaintiff has failed to allege facts plausibly suggesting a claim for

intentional infliction of emotional distress.  (*Id.* at 5-6.)

## II.     RELEVANT LEGAL STANDARD

It has long been understood that a dismissal for failure to state a claim upon which relief

can be granted, pursuant to Fed. R. Civ. P. 12(b)(6), can be based on one or both of two grounds:

(1) a challenge to the "sufficiency of the pleading" under Fed. R. Civ. P. 8(a)(2); or (2) a

challenge to the legal cognizability of the claim.  *Jackson v. Onondaga Cty.*, 549 F. Supp. 2d

204, 211, nn. 15-16 (N.D.N.Y. 2008) (McAvoy, J., adopting Report-Recommendation on *de

novo* review).

Because such dismissals are often based on the first ground, a few words regarding that

ground are appropriate.  Rule 8(a)(2) of the Federal Rules of Civil Procedure requires that a

pleading contain "a *short and plain* statement of the claim *showing* that the pleader is entitled to

relief."  Fed. R. Civ. P. 8(a)(2) [emphasis added].  In the Court's view, this tension between

permitting a "short and plain statement" and requiring that the statement "show[]" an entitlement

to relief is often at the heart of misunderstandings that occur regarding the pleading standard

established by Fed. R. Civ. P. 8(a)(2).

On the one hand, the Supreme Court has long characterized the "short and plain" pleading standard under Fed. R. Civ. P. 8(a)(2) as "simplified" and "liberal." *Jackson*, 549 F. Supp. 2d at 212, n.20 (citing Supreme Court case).  On the other hand, the Supreme Court has held that, by requiring the above-described "showing," the pleading standard under Fed. R. Civ. P. 8(a)(2) requires that the pleading contain a statement that "give[s] the defendant *fair notice* of what the plaintiff's claim is and the grounds upon which it rests." *Jackson*, 549 F. Supp. 2d at 212, n.17 (citing Supreme Court cases) (emphasis added).

The Supreme Court has explained that such *fair notice* has the important purpose of "enabl[ing] the adverse party to answer and prepare for trial" and "facilitat[ing] a proper decision on the merits" by the court.  *Jackson*, 549 F. Supp. 2d at 212, n.18 (citing Supreme Court cases); *Rusyniak v. Gensini*, 629 F. Supp. 2d 203, 213 & n.32 (N.D.N.Y. 2009) (Suddaby, J.) (citing Second Circuit cases).  For this reason, as one commentator has correctly observed, the "liberal" notice pleading standard "has its limits."  2 *Moore's Federal Practice* § 12.34[1][b] at 12-61 (3d ed. 2003).  For example, numerous Supreme Court and Second Circuit decisions exist holding that a pleading has failed to meet the "liberal" notice pleading standard.  *Rusyniak,* 629 F. Supp. 2d at 213, n.22 (citing Supreme Court and Second Circuit cases); *see also Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949-52 (2009).

Most notably, in *Bell Atl. Corp. v. Twombly*, the Supreme Court reversed an appellate decision holding that a complaint had stated an actionable antitrust claim under 15 U.S.C. § 1. *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955 (2007).  In doing so, the Court "retire[d]" the famous statement by the Court in *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957), that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the

plaintiff can prove no set of facts in support of his claim which would entitle him to relief."

*Twombly*, 127 S. Ct. at 1968-69.  Rather than turn on the *conceivability* of an actionable claim,

the Court clarified, the "fair notice" standard turns on the *plausibility* of an actionable claim.  *Id*.

at 1965-74.  The Court explained that, while this does not mean that a pleading need "set out in

detail the facts upon which [the claim is based]," it does mean that the pleading must contain at

least "some factual allegation[s]."  *Id*. at 1965.  More specifically, the "[f]actual allegations must

be enough to raise a right to relief above the speculative level [to a plausible level]," assuming

(of course) that all the allegations in the complaint are true.  *Id*.

      As for the nature of what is "plausible," the Supreme Court explained that "[a] claim has

facial plausibility when the plaintiff pleads factual content that allows the court to draw the

reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*,

129 S.Ct. 1937, 1949 (2009).  "[D]etermining whether a complaint states a plausible claim for

relief . . . [is] a context-specific task that requires the reviewing court to draw on its judicial

experience and common sense. . . .  [W]here the well-pleaded facts do not permit the court to

infer more than the mere possibility of misconduct, the complaint has alleged–but it has not

show[n]–that the pleader is entitled to relief."  *Iqbal*, 129 S.Ct. at 1950 [internal quotation marks

and citations omitted].  However, while the plausibility standard "asks for more than a sheer

possibility that a defendant has acted unlawfully," *id*., it "does not impose a probability

requirement."  *Twombly*, 550 U.S. at 556.

      Because of this requirement of factual allegations plausibly suggesting an entitlement to

relief, "the tenet that a court must accept as true all of the allegations contained in the complaint

is inapplicable to legal conclusions.  Threadbare recitals of the elements of a cause of action,

supported by merely conclusory statements, do not suffice." *Iqbal*, 129 S. Ct. at 1949.

Similarly, a pleading that only "tenders naked assertions devoid of further factual enhancement"

will not suffice. *Iqbal*, 129 S.Ct. at 1949 (internal citations and alterations omitted). Rule 8

"demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.*

(citations omitted).

This pleading standard applies even to *pro se* litigants. While the special leniency

afforded to *pro se* civil rights litigants somewhat loosens the procedural rules governing the form

of pleadings (as the Second Circuit has observed), it does not completely relieve a *pro se*

plaintiff of the duty to satisfy the pleading standards set forth in Fed. R. Civ. P. 8, 10 and 12.[2]

Rather, as both the Supreme Court and Second Circuit have repeatedly recognized, the

requirements set forth in Fed. R. Civ. P. 8, 10 and 12 are procedural rules that even *pro se* civil

rights plaintiffs must follow.[3] Stated more simply, when a plaintiff is proceeding *pro se*, "all

normal rules of pleading are not absolutely suspended." *Jackson*, 549 F. Supp. 2d at 214, n.28

[citations omitted].[4]

---

[2]        *See Vega v. Artus,* 610 F. Supp. 2d 185, 196 & nn.8-9 (N.D.N.Y. 2009) (Suddaby, J.) (citing Second Circuit cases); *Rusyniak,* 629 F. Supp. 2d at 214 & n.34 (citing Second Circuit cases).

[3]        *See Rosendale v. Brusie*, 374 F. App'x 195, 196 (2d Cir. 2010) ("[A]lthough the courts remain obligated to construe a pro se complaint liberally, . . . the complaint must contain sufficient factual allegations to meet the plausibility standard."); *Vega,* 610 F. Supp. 2d at 196, n.10 (citing Supreme Court and Second Circuit cases); *Rusyniak,* 629 F. Supp. 2d at 214 & n.34 (citing Second Circuit cases).

[4]        It should be emphasized that Fed. R. Civ. P. 8's plausibility standard, explained in *Twombly*, was in no way retracted or diminished by the Supreme Court's decision (two weeks later) in *Erickson v. Pardus*, in which (when reviewing a *pro se* pleading) the Court stated, "*Specific* facts are not necessary" to successfully state a claim under Fed. R. Civ. P. 8(a)(2). *Erickson v. Pardus*, 127 S. Ct. 2197, 2200 (2007) [emphasis added]. That statement was merely an abbreviation of the often-repeated point of law–first offered in *Conley* and repeated in

Finally, a few words are appropriate regarding what documents are considered when a dismissal for failure to state a claim is contemplated. Generally, when contemplating a dismissal pursuant to Fed. R. Civ. P. 12(b)(6) or Fed. R. Civ. P. 12(c), the following matters outside the four corners of the complaint may be considered without triggering the standard governing a motion for summary judgment: (1) documents attached as an exhibit to the complaint or answer, (2) documents incorporated by reference in the complaint (and provided by the parties), (3) documents that, although not incorporated by reference, are "integral" to the complaint, or (4) any matter of which the court can take judicial notice for the factual background of the case.[5]

_____

*Twombly*–that a pleading need not "set out *in detail* the facts upon which [the claim is based]" in order to successfully state a claim. *Twombly,* 127 S. Ct. 1965, n.3 (citing *Conley,* 355 U.S. at 47) [emphasis added]. That statement did not mean that all pleadings may achieve the requirement of "fair notice" without ever alleging any facts whatsoever. Clearly, there must still be enough fact set out (however set out, whether in detail or in a generalized fashion) to raise a right to relief above the speculative level to a plausible level. *See Rusyniak,* 629 F. Supp. 2d at 214 & n.35 (explaining holding in *Erickson*).

     [5]     *See* Fed. R. Civ. P. 10(c) ("A copy of any written instrument which is an exhibit to a pleading is a part thereof for all purposes."); *L-7 Designs, Inc. v. Old Navy, LLC*, No. 10-573, 2011 WL 2135734, at *1 (2d Cir. June 1, 2011) (explaining that conversion from a motion to dismiss for failure to state a claim to a motion for summary judgment is not necessary under Fed. R. Civ. P. 12[d] if the "matters outside the pleadings" in consist of [1] documents attached to the complaint or answer, [2] documents incorporated by reference in the complaint (and provided by the parties), [3] documents that, although not incorporated by reference, are "integral" to the complaint, or [4] any matter of which the court can take judicial notice for the factual background of the case); *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010) (explaining that a district court considering a dismissal pursuant to Fed. R. Civ. 12(b)(6) "may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint. . . . Where a document is not incorporated by reference, the court may neverless consider it where the complaint relies heavily upon its terms and effect, thereby rendering the document 'integral' to the complaint. . . . However, even if a document is 'integral' to the complaint, it must be clear on the record that no dispute exists regarding the authenticity or accuracy of the document. It must also be clear that there exist no material disputed issues of fact regarding the relevance of the document.") [internal quotation marks and citations omitted]; *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2009) ("The complaint is deemed to include any written instrument attached to it as

III.    ANALYSIS

A.    Whether the Confidential Separation Agreement and General Release
Executed by the Parties Has Been Invalidated

After carefully considering the matter, the Court answers this question in the negative for

the reasons stated in Defendants' memoranda of law.  *See, supra,* Parts I.B.1. and I.B.3. of this

Decision and Order. To those reasons, the Court adds the following analysis.

As an initial matter, the Court finds that the Separation Agreement and General Release

are enforceable based on the totality of the circumstances alleged by Plaintiff.  *See Montanez v.*

*Cheesecake Factory Rest.*, 13-CV-1262, 2016 WL 1117516, at *2-3 (N.D.N.Y. Mar. 22, 2016)

(Suddaby, C.J.) (discussing the "totality of the circumstances" inquiry that is necessary to

ascertain whether a release was "knowing and voluntary"), *aff'd*, 675 F. App'x 77 (2d Cir.

2017), *cert. denied*, 138 S. Ct. 206 (2017).  Therefore, pursuant to the Release, Plaintiff has

waived her claims against Defendants.  (Dkt. No. 28, Attach. 2, at 8-9 [Defs.' Mem. of Law];

Dkt. No. 28, Attach. 4, at 5, ¶ 6 [Confidential Separation Agreement & General Release].)[6]

Although Plaintiff claims that the terms of the Separation Agreement and Release have

been invalidated due to the actions of Defendant Hurley following the execution of the

---

an exhibit or any statements or documents incorporated in it by reference.") (internal quotation
marks and citations omitted); *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*, 62 F.3d 69, 72
(2d Cir.1995) (per curiam) ("[W]hen a plaintiff chooses not to attach to the complaint or
incorporate by reference a [document] upon which it solely relies and which is integral to the
complaint," the court may nevertheless take the document into consideration in deciding [a]
defendant's motion to dismiss, without converting the proceeding to one for summary
judgment.") (internal quotation marks and citation omitted).

[6]      The Court notes that it may consider the Confidential Separation Agreement and
General Release as incorporated by reference in the Amended Complaint.  *See, supra,* Part II &
n.5 of this Decision and Order.  Once again, page citations refer to the page numbers used on
CM/ECF rather than the actual page numbers contained in the documents themselves.

documents, the Court agrees with Defendants that the terms of the Release regarding

confidentiality and non-disparagement applied only to Plaintiff. Specifically, the relevant

portions of the provision entitled "Confidentiality and Non-Disparagement" state as follows:

"*You* shall refrain from all conduct, verbal or otherwise, that disparages or damages or could

disparage or damage the reputation, goodwill, or standing in the community of the Company or

any of the other Released parties." (Dkt. No. 28, Attach. 4, at 8, ¶ 9[e]) (emphasis added).

Similarly, the Release states that "*you* shall not disclose the existence or terms of this Agreement

to any third parties . . . ." (*Id.*, ¶ 9[d]) (emphasis added). As Defendants correctly argue, there

are no similar provisions requiring HMH and/or its employees to refrain from discussing the

Release with third parties or making negative statements about Plaintiff. *See Sengillo v. Valeo*

*Elec. Sys., Inc.*, 328 F. App'x 39, 41-42 (2d Cir. 2009) (holding that the district court "properly

dismissed plaintiff's breach of contract claim . . . because . . . VESI's internal disclosure to

[another hiring manager] of the fact that plaintiff was terminated for poor performance did not

amount to a breach of VESI's settlement agreement with plaintiff since the agreement did not

obligate VESI to avoid such disclosures"). The fact that Paragraph 6(a) of the Release defines

the term "Released Parties" as both Defendants and their "past [and] present . . . employees"

does not somehow mean that Paragraphs 9(d) and 9(e) of the Release (which expressly apply

only Plaintiff) prohibit *Defendants* from engaging in disparagement.

Accordingly, Plaintiff's first fourteen claims are dismissed.

**B.     Whether Plaintiff's Fifteenth Claim Should Be Dismissed**

After carefully considering the matter, the Court answers this question in the affirmative

for the reasons stated by Defendants in their memoranda of law. *See, supra,* Parts I.B.1. and

I.B.3. of this Decision and Order. To those reasons, the Court adds the following three points.

First, because the Court has found that the Release is enforceable, the Court finds that any allegations regarding Defendants' respective conduct that occurred before the Release was executed may not be considered because Plaintiff has waived those claims.[7]  Similarly, because the Release did not preclude HMH and/or its employees (such as Defendant Hurley) from discussing the contents of the Separation Agreement or from disparaging Plaintiff, the Court need consider only whether Defendant Hurley's alleged statements to third parties about Plaintiff plausibly suggest "extreme and outrageous" conduct.  With regard to this issue, the Court agrees with Defendants that Defendant Hurley's alleged statements to third parties, in and of themselves, do not plausibly suggest "extreme and outrageous" conduct.  (Dkt. No. 28, Attach. 2, at 20 [Defs.' Mem. of Law].)

Second, the Court agrees with Defendants that statements made in the context of an EEOC proceeding are absolutely privileged and cannot give rise to liability.  *See Morales v. City of New York*, 14-CV-7253, 2016 WL 9651130, at *8 (S.D.N.Y. Aug. 9, 2016) ("[D]efendants also correctly assert that their position statements to the NYSDHR and EEOC are entitled to absolute immunity.").

Third, and finally, because of Plaintiff's *pro se* status,[8] and despite her express delineation of claims in her Amended Complaint, the Court liberally construes Paragraph 133 of that Amended Complaint (Dkt. No. 25, at ¶ 133) and Paragraph 13 of her opposition

---

[7]     This finding is important because courts in this Circuit have found that allegations of sexual harassment may, under certain circumstances, serve as the basis for a claim of intentional infliction of emotional distress.

[8]     *See Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474-75 (2d Cir. 2006) (recognizing that, where plaintiffs proceed pro se, courts must construe their complaints with "special solicitude" and interpret them to raise the "strongest [claims] that they suggest").

memorandum of law (Dkt. No. 30, ¶ 13)[9] as also attempting to assert post-Release claims for

defamation and tortious interference with prospective economic advantage.  *See, e.g., Pasqualini*

*v. MortgageIT, Inc.*, 498 F. Supp. 2d 659, 664 (S.D.N.Y. 2007).  Of course, where a district court

has dismissed all claims over which it has original jurisdiction, the court may decline to exercise

supplemental jurisdiction over remaining state law claims.[10]  (This is so even if the court has

already addressed the pleading insufficiency of other of the plaintiff's state law claims.)[11]  The

decision is a discretionary one, and its justification lies in considerations of judicial economy,

---

[9]      *See Drake v. Delta Air Lines, Inc.*, 147 F.3d 169, 170 n.1 (2d Cir. 1998) ("[W]e deem Drake's [pro se] complaint to include the facts contained in his memorandum of law filed in response to Delta's 1996 motion to dismiss."); *Gill v. Mooney*, 824, F.2d 192, 195 (2d Cir. 1987) (considering assertion in affidavit submitted in opposition to defendant's motion to dismiss, in construing the allegations of pro se complaint).

[10]     28 U.S.C. § 1367(c)(3); *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966) ("[P]endent jurisdiction is a doctrine of discretion, not of plaintiff's right. Its justification lies in considerations of judicial economy, convenience and fairness to litigants; if . . . not present a federal court should hesitate to exercise jurisdiction over state claims."); *Klein & Co. Futures, Inc. v. Bd. of Trade of City of New York*, 464 F.3d 255, 262 (2d Cir. 2006) ("It is well settled that where, as here, the federal claims are eliminated in the early stages of litigation, courts should generally decline to exercise pendent jurisdiction over remaining state law claims.").

[11]     *See Sussman-Automatic Corp. v. SPA World Corp.*, 15 F. Supp.3d 258, 273 (E.D.N.Y. 2014) ("[N]othing in the text of 28 U.S.C. § 1367(c)(3) prevents a Court from exercising supplemental jurisdiction over some, but not all, of the relevant state law claims."); *Tomaiolo v. Mallinoff,* 281 F.3d 1, 5 (1ˢᵗ Cir. 2002) ("[W]e hold that the district court did not abuse its discretion in exercising supplemental jurisdiction over some, but not all, of the state law claims . . . ."); *Wood v. Everhome Mort.*, 11-CV-3829, 2012 WL 13012634, at *5, n.5 (N.D. Ga. Sept. 21, 2012) ("[S]upplemental jurisdiction is not all or nothing. The Court has the discretion to exercise supplemental jurisdiction to reach the merits of some state law claims and decline to reach the merits (and to remand) others."); *Hyman v. WM Fin. Servs., Inc.*, 06-CV-4038, 2007 WL 1657392, at *5, n.3 (D. N.J. June 7, 2007) ("The Court is within its authority to exercise supplemental jurisdiction over some, but not all, of Plaintiffs' state law claims.").

convenience and fairness to litigants.[12] Here, after carefully considering the relevant factors (i.e.,

economy, convenience, fairness and comity), the Court finds that they weigh decidedly in favor

of declining to exercise supplemental jurisdiction over the two above-referenced state law

claims.

> **ACCORDINGLY**, it is

> **ORDERED** that Defendants' motion to dismiss Plaintiff's Amended Complaint for

failure to state a claim upon which relief may be granted (Dkt. No. 28) is **GRANTED**; and it is

further

> **ORDERED** Plaintiff's Amended Complaint (Dkt. No. 25) is **DISMISSED with**

**prejudice EXCEPT** for Plaintiff's post-Release claims for defamation and tortious interference

with prospective economic advantage under state law, which are **DISMISSED without**

**prejudice** to filing in state court within the applicable limitations period; and it is further

> **ORDERED** that the Clerk of Court shall issue a judgment for Defendants and close this

action.

Dated: January 10, 2018
       Syracuse, New York

Hon. Glenn T. Suddaby
Chief U.S. District Judge

---

[12]     *See United Mine Workers of Am.*, 383 U.S. at 726; *see also Kolari v. New York-Presbyterian Hosp.*, 455 F.3d 118, 122 (2d Cir.2006) ("Once a district court's discretion is triggered under § 1367(c)(3), it balances the traditional 'values of judicial economy, convenience, fairness, and comity,' in deciding whether to exercise jurisdiction.") (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 [1988]); *Jones v. Ford Motor Credit Co.*, 358 F.3d 205, 214 (2d Cir.2004) ("[W]here at least one of the subsection 1367(c) factors is applicable, a district court should not decline to exercise supplemental jurisdiction unless it also determines that doing so would not promote the values [of] economy, convenience, fairness, and comity.").